UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSÉ RUIZ,<br><br>         Plaintiff,<br><br>    v.<br><br>CRÉDIT AGRICOLE CORPORATE<br>AND INVESTMENT BANK and<br>ANTHONY BOTTING,<br><br>         Defendants. | No. 22-cv-10777<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff José Ruiz ("Ruiz"), by his undersigned attorneys, Reavis Page Jump LLP, for his Complaint against defendants Crédit Agricole Corporate and Investment Bank ("CACIB") and Anthony Botting ("Botting") (together, "Defendants"), alleges as follows:

## NATURE OF ACTION

1. Ruiz brings this action against his former employer CACIB and against Botting, one of his former supervisors, for discrimination on the basis of race, color, and national origin, for hostile work environment, and for unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, as amended, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL").

2. Ruiz – who is Latinx and of Peruvian background – joined CACIB in 2010. He was a dedicated, successful, and well-regarded Wall Street trader, and was quickly promoted.

3. In 2015, however, one of Ruiz's new managers, Botting, began to target him based on his ethnicity and national origin. Botting, together with other senior management, exemplified

a culture of preferential treatment for White males, and of racially and ethnically motivated discrimination against those who did not look the part, that permeated the executive ranks of the bank and that often trickled down to and was condoned in less-senior employees. Indeed, in a separate employment discrimination matter brought against the bank in the United Kingdom, Botting was found to have made directly racially discriminatory, negatively stereotyping comments about another non-White employee he supervised at the bank.

4. Ruiz and his other minority colleagues at CACIB were treated far worse than their White counterparts. They were subjected to stereotypically offensive, overtly racist, and degrading comments; they were berated, belittled, and humiliated, while Caucasian traders were praised, supported, and given the benefit of the doubt; they were held to double standards and given inaccurate, unfairly negative reviews; and they were denied career opportunities and the full monetary benefits of successful performance, all on the basis of their race or ethnicity.

5. Ruiz had the courage to push back and to report to Human Resources and senior executives, on multiple occasions, about the unequal treatment and hostile work environment that he and other non-Whites were experiencing. Those efforts were rebuffed, with CACIB leadership choosing instead to retaliate against him based on his honest communications. In violation of the law, Ruiz was blocked from well-deserved professional advancement; punished with reduced compensation; subjected to unjust criticism; treated with distance and disdain; and eventually terminated on pretextual grounds.

**THE PARTIES**

6. Plaintiff Ruiz is an individual who was formerly employed by CACIB in New York City. He currently resides in Montauk, New York.

7. Upon information and belief, defendant CACIB is licensed in the State of New

York as a foreign branch of the French-based commercial banking corporation Crédit Agricole Corporate and Investment Bank, S.A. (together, with CACIB or other branches as appropriate, the "Bank"), which is in turn part of the Crédit Agricole Group ("Crédit Agricole").  CACIB specializes in the businesses of capital markets and investment and commercial banking, and has its principal place of business at 1301 Sixth Avenue, New York, New York 10019.  At all relevant times, CACIB was an "employer" of Ruiz, as defined under applicable law.

8. Upon information and belief, defendant Botting is an individual who resides in London, United Kingdom and who was formerly employed by the London-based branch of Crédit Agricole Corporate and Investment Bank, S.A., during which time he supervised Ruiz.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331, in that it involves a federal question under the employment discrimination laws of the United States, namely, 42 U.S.C. § 2000e *et seq*.  This Court has supplemental jurisdiction over Ruiz's state and local statutory claims, pursuant to 28 U.S.C. § 1367(a), because such claims arise from the same or closely related conduct of the Defendants.

10. This Court has personal jurisdiction over the Defendants because: (i) defendant CACIB's principal place of business is in the State of New York; and (ii) both defendant CACIB and defendant Botting intentionally acted in such a way as to cause injury to Ruiz in the State of New York.

11. Venue is proper in this district by virtue of 42 U.S.C. § 2000e, which provides in relevant part that venue may be in any district court in the state where the discriminatory acts took place, *see* 42 U.S.C. § 2000e-5(f)(3); and by virtue of 28 U.S.C. § 1391(b) and (c), because one of the Defendants resides in this district, because this is the judicial district in which a substantial part

of the events or omissions giving rise to the claims occurred, because a defendant not resident in the United States may be sued in any judicial district (with the joinder of such a defendant disregarded in determining where the action may be brought with respect to other defendants), and/or because each of the Defendants is subject to personal jurisdiction within the district.

## FACTS COMMON TO ALL CLAIMS

### A.     Ruiz's Background and Employment History

12. Ruiz is a non-White Latinx male, of Peruvian heritage. He was born in the United States and is an American citizen.

13. After graduating from Dartmouth College, Ruiz received an MBA from the UCLA Anderson School of Management.

14. Ruiz has spent his entire professional career excelling in the financial services industry. In 2004, he began working at American Express, where he was Head of EM [*i.e.*, Emerging Markets] Trading – Americas; then, starting in 2006, he worked at Bank of Ireland Global Markets as a Senior Trader.

15. In 2010, Ruiz joined CACIB at the Director level and as Head of the FX [*i.e.*, Foreign Exchange] Trading Desk for the Americas.

16. Over the next four years, Ruiz outperformed his revenue benchmarks, was highlighted as "best in class," and received consistently positive reviews.

17. In 2014, Ruiz was promoted to Managing Director.

18. In 2015, Ruiz was again promoted, to Head of Emerging Market Trading for FX, Interest Rate Derivatives, and Credit. Notably, "emerging markets" is generally one of the few areas in global financial firms where Latinx people are hired at or promoted to senior positions.

B. **Ruiz and Non-White Colleagues Are Discriminated Against**

19. Despite his track record of achievement and continuing productivity, Ruiz began in 2015 to experience targeted, unfair treatment and discrimination from Botting, one of his new managers. Over the years that Ruiz worked under or in close connection with him, Botting was variously the Global Head of Linear FX Trading, of Emerging Markets FX & Rates Trading, and of G10 FX Trading. ("G10" refers to the major currencies of Europe and North America.)

20. Botting consistently and routinely treated Ruiz, as well as colleagues of Ruiz's who were also persons of color, disrespectfully. And just as consistently and routinely, Botting favored Ruiz's White counterparts.

21. In one particularly egregious incident in the fall of 2015, Botting publicly humiliated Ruiz at a dinner with managers and colleagues, suggesting that Ruiz did not know how to trade Emerging Markets FX and denigrating him for having not worked at a large bank. Ruiz's colleagues came up to him afterward to comment that they had never seen such behavior and to compliment him for defending himself against Botting's unwarranted abuse.

22. Thereafter, Ruiz's interactions with Botting became more sporadic, as the reporting structure changed. Nevertheless, whenever Ruiz needed to interact with him, Botting addressed Ruiz in a disrespectful and demeaning manner.

23. In 2017, Ruiz was again forced to report to Botting, and his mistreatment of Ruiz worsened. The two began having disagreements, which led to Botting micromanaging Ruiz and frequently berating him over the phone with criticisms over minor issues. Botting also bombarded Ruiz with negative e-mails.

24. During this time, Botting hired two new traders, Stuart Oakley ("Oakley") and Tanya Laing ("Laing"), both of whom were Caucasian. Although Ruiz had been very successful

working on the Asia trading desk, Botting took that line of business away from Ruiz and gave it to Oakley.

25.     Botting then told Ruiz of his new hires, "This is what trading managers look like – you need to emulate them." Ultimately, however, neither Oakley nor Laing was successful in their positions, and both left Crédit Agricole within a year or so.

26.     In October 2018, Ruiz reported Botting's abuse to Kelly Cox ("Cox"), in CACIB's Human Resources department. Ruiz was reluctant at this time to charge Botting with discrimination on the basis of race, color, and national origin because he feared that he would be blackballed within the Bank and in the industry for raising the issue. He made clear to Cox, however, that Botting's treatment of him was unfair and unacceptable. But Human Resources concluded that it was merely a "style issue."

27.     After that, Bryan Scarfone ("Scarfone"), Head of Sales and Trading – Americas, approached Ruiz to see if he would be willing to accept a severance package to leave CACIB, since Botting was unlikely to be terminated. Ruiz rejected Scarfone's offer, as he enjoyed his work and hoped the situation with Botting would improve.

28.     Since Human Resources did not take any action against Botting following Ruiz's complaints, Botting's abuse and retaliation continued. At the end of 2018, following his report to Human Resources, Ruiz, for the first time in his career at CACIB, received a negative performance review and his bonus was significantly decreased, to $160,000, down from the $290,000 to $320,000 range of the preceding years.

29.     Unfortunately, Ruiz was not the only person of color at CACIB whom Mr. Botting mistreated. Indeed, Ruiz observed a pattern discriminatory treatment, with Botting protecting underperforming White traders while attacking minority traders.

30. In one such incident, Botting told everyone on the desk that Arturo Bolanos, a Hispanic trader, was a terrible trader and could only make easy money. Botting also repeatedly insulted Wycliffe Brown ("Brown"), an older Black trader. For example, Botting stated that Brown had not earned an increase in his bonus for 2019, even though Brown was 75% above his budget for that year. Scarfone told Ruiz that Botting frequently discussed terminating Brown, despite Brown's consistently solid performance.

31. Moreover, under Botting's supervision, Douglas Jordan ("Jordan"), whom Botting had hired, was allowed to be overtly rude to non-White employees, such as Brown and Craig Vargas ("Vargas"), who was Hispanic. For example, Jordan demanded that Vargas, a trader, get him breakfast every morning, and when Vargas refused, Jordan told him he wasn't "career-minded." Though Jordan consistently underperformed in his role, Botting protected him and his position until Jordan was finally terminated by CACIB. Jordan also hired Don Cummings ("Cummings"), a Caucasian trader with less experience than Brown, at a higher salary than Brown's. Cummings, however, was never able to earn positive performance in his time at CACIB.

32. Notably, Botting's discriminatory treatment of another non-White employee at the Bank was front and center in a successful employment discrimination claim brought against the Bank in the United Kingdom. In that matter – *Yang v. Credit Agricole (Corporate & Investment Bank) London Branch*, Case No. 2207054/2020 (London Central Employment Tribunal) – the tribunal found that the Bank, through racially stereotyping comments made by Botting in May 2020, had subjected the claimant, a Chinese expatriate working in London under Botting's supervision, to unlawful "direct race discrimination." The tribunal concluded that Botting's remarks about the claimant and "Asian people" constituted inappropriate stereotyping on racial grounds, and was "satisfied" based on the evidence presented "that a white Caucasian would not

have been subjected to the same negative stereotyping."

C.     **Ruiz Experiences Further Discrimination, Raises the Issue, and Suffers Retaliation**

33.    In December 2018, CACIB created a new position called Head of FX, which was senior to Ruiz's position at the time but for which he was particularly well qualified. However, the Bank did not even inform him of the creation of this position, much less give him the opportunity to interview for it. Instead, CACIB hired Eric Darwell ("Darwell"), a Caucasian male from outside the Bank, who became Ruiz's manager.

34.    Under Darwell's supervision, Ruiz continued to be mistreated based on his ethnicity and national origin. Other traders on the floor made disparaging comments about his heritage, including jokes that all Peruvians are gardeners or perform manual labor, and making fun of Spanish food and equating it to Taco Bell. Darwell overheard these comments and took no action to stop them. Instead, he discussed his "favorite" racist jokes that were made on the trading floor, thereby implicitly approving such behavior.

35.    Ruiz was also treated inequitably by the Bank in connection with a November 2018 incident involving Cargill, Incorporated ("Cargill"), for which Ruiz received an undeserved written disciplinary warning. On November 1, 2018, the Cargill trader booked two trades that did not reflect the market price. In light of Cargill's history of predatory trading on prices that did not reflect actual market prices, and with approval from the sales person in charge of the account in New York, Ruiz proposed that the client be disabled from electronic trading for Latin America ("LatAm") Non-Deliverable Forwards, which are a form of foreign exchange transactions used to provide liquidity in or hedge exposure against non-convertible currencies. At the time, there was no established protocol for getting senior management's approval of such an action, and as Global Head of LatAm trading, Ruiz reasonably believed that he had the discretion to take such action, in

order to protect the trading desk.  Ruiz immediately notified both Botting and Gagan Verma, who was the main Global FX salesperson for the account, about the issue.  Neither of them told Ruiz not to proceed.  A week later, after the client threatened to take business away, Ruiz instructed the electronic sales team to restore the trading privileges.  Senior management at the Bank then unfairly began to accuse Ruiz of breaking Bank policy.

36.     Regarding the warning that Ruiz received for the incident, Darwell later admitted that Ruiz had been treated unfairly.  Gene Kim ("Kim"), Head of International and the Americas for the Bank's Global Markets Division, also admitted that, after reviewing four years of emails, he had found no evidence that Ruiz had violated any established policy or guidelines.  That is critical because, at financial institutions like CACIB, an applicable policy or guideline on such matters would need to be written out, and employees would be required to review and adhere to those policies and guidelines.  Here, there had not been any such policies or guidelines.

37.     In February 2019, Ruiz requested a meeting with Kim to discuss Botting's worsening treatment of him.  During the meeting, Ruiz told Kim that he believed Botting's mistreatment of him was racially motivated.  Kim acknowledged that Botting's behavior toward Ruiz was unacceptable and said that Botting would receive a strong warning.  But Ruiz never received any follow-up from CACIB about any such warning to Botting, so he is unaware whether any action was ever taken.

38.     Also in February 2019, Ruiz met once again with Human Resources about Botting's conduct.  This time he directly raised his concerns that he and other non-White colleagues were being mistreated due to race or national origin.  He told Human Resources that, as a result of such discrimination, he had been unfairly disciplined for the Cargill incident and improperly accused of violating a procedure that did not even exist.

39. Following this meeting with Human Resources, Ruiz was ostracized by his colleagues and managers, who stopped inviting him to management meetings, as well as to team dinners and outings.

40. Additionally, although the total budget for the LatAm FX desk was €9.5 million, Ruiz and Nelson Lopez ("Lopez"), the other Hispanic trader on the desk, were assigned inflated budgets of €6 million each. This meant that Darwell, as manager on the desk and a favored Caucasian, would have been seen as having successfully led the business to meet budget even if Ruiz and Lopez had made €4.75 million each, whereas Ruiz and Lopez, as unfavorably treated non-White traders, would have been seen in that same scenario as having missed their individual budgets by approximately 25% each. Similarly, if Ruiz and Lopez had made €6 million each, then Darwell could still have been seen having successfully led the business to meet budget even if he (Darwell) had lost €2.5 million by virtue of his own poor trading. In other words, Darwell (a Caucasian) was given a reasonable trading budget for the desk and was set up to succeed, while Ruiz and Lopez (both non-Caucasian), by contrast, were given artificially high budgets and set up to fail. Indeed, Lopez was subsequently let go for supposed underperformance, which was in fact caused by his artificially high budget. Lopez's replacement, Jesse Bass, who is Caucasian, was assigned a far more reasonable budget of €3.5 million, despite receiving compensation similar to Lopez's.

41. In January 2020, Ruiz met yet again with Cox in Human Resources, where he discussed his concerns regarding his review, and requested executive coaching. Ruiz was told that the Bank did not hire executive coaches as a normal course of business, but that he could speak with Kashif Zafar ("Zafar"), Head of Global Markets Division – Americas, about the possibility of retaining an executive coach. But rather than assist Ruiz with this request, Zafar berated him

for several hours for raising any issues regarding his review and shamed him for asking for help. (Ironically, Botting was provided coaching by the very same coach whom CACIB refused to provide to Ruiz.)

42. In February 2020, despite finishing at a run rate that exceeded his budget for the year, Ruiz received an annual bonus of $100,000 – a material decrease from his typical bonuses and less than that of many of his Caucasian colleagues. Ruiz spoke with Human Resources and Darwell regarding the decreased bonus, and Darwell said he felt that Ruiz should have received a $200,000 bonus, but that there was "nothing he could do." In contrast with Ruiz's having received that decreased bonus, Caucasian trader Vincent Marcigliano received a $140,000 bonus, although he had lost money for the year. This was the same year in which Brown did not receive an increase in his bonus, even though he was 75% above his budget for the year. In discussions regarding his diminished bonus, Ruiz specifically informed Darwell that he was being retaliated against for having spoken with Human Resources.

43. In March 2020, Ruiz was singled out again for investigation and punishment by CACIB. This related to his involvement in a trade in which the salesperson did not inform a client of a partial fill for a discretionary order. Ruiz told the salesperson that he had an obligation to fill the order and inform the client, which was eventually done. Although such a minor incident normally would have warranted little attention (and which indeed was ultimately determined not to have been a breach of protocol), there was a spotlight on Ruiz, since he had complained to Human Resources about his discriminatory treatment, and the issue was escalated to Compliance.

44. Compliance originally determined that Ruiz had acted appropriately, since he had given the fill order to sales properly, and that it was the salesperson who had failed in his responsibility. However, since management was looking for an excuse to fire Ruiz, they asked

that Compliance review the matter again.  After the Compliance officer who had been in charge of the investigation recused himself, it was then determined, in line with management's efforts to get rid of Ruiz, that there had been an issue with Ruiz's "communication," even though multiple witnesses supported his version of the events.

**D.**     **Ruiz Is Terminated on Pretextual Grounds**

45.     When the pandemic hit in March 2020, Ruiz risked his health to go into the office to help facilitate client business, bring in revenues to CACIB, and show his loyalty, all despite the poor treatment he had been receiving.

46.     Nevertheless, he was terminated by CACIB on May 11, 2020, for purported communication issues.

47.     There was no legitimate basis for this termination, as he had performed well and his revenues were among the highest in his group.  Instead, he was let go because he had raised uncomfortable truths regarding CACIB's discriminatory treatment of minorities.

48.     In fact, one of Ruiz's fellow employees had been informed as far back as January 2020 that CACIB was looking for a way to fire him.  All of the issues that purportedly arose after that date were purely pretextual.

## ADMINISTRATIVE PROCEDURES

49.     On March 8, 2021, Ruiz filed a charge of discrimination embodying the claims set forth in this Complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"), the New York State Division of Human Rights, and the New York City Commission on Human Rights.

50.     On September 29, 2022, the EEOC issued a Notice of Right to Sue to Ruiz.

**FIRST CAUSE OF ACTION**
**<u>AGAINST DEFENDANT CACIB</u>**
**(Unlawful Employment Discrimination & Retaliation in Violation of Title VII)**

51. Ruiz repeats and realleges each and every allegation contained in paragraphs 1 through 50 of this Complaint.

52. Title VII prohibits, among other things, discharging, retaliating against, or otherwise discriminating against an employee based on his race, color, or national origin.

53. Starting in 2015, CACIB initiated a continuing campaign of discrimination against Ruiz in the terms and condition of his employment based on his race, color, and national origin, which continued through his wrongful termination in May 2020.

54. Moreover, during this period, CACIB created an intimidating, hostile, and offensive work environment for Ruiz, based on his race, color, and national origin, through the discriminatory comments of its management, adverse actions, and practices.

55. CACIB also unlawfully retaliated against Ruiz for reporting and complaining of CACIB's discrimination and hostile work environment.

56. These actions, taken singly and in their entirety, constitute unlawful discrimination in violation of Title VII.

57. CACIB's conduct was malicious, wanton, and reckless or in willful disregard for Ruiz's rights, and continued a pattern of discrimination by CACIB directed towards non-Caucasian employees.

58. As a direct, proximate, and foreseeable cause of CACIB's Title VII violations, Ruiz suffered humiliation, embarrassment, mental and emotional discomfort, damage to his reputation and economic opportunities, and loss of wages, other compensation, and benefits.

59. As a further proximate result of CACIB's unlawful employment practices, Ruiz has

had to incur attorneys' fees, costs, and incidental expenses.

60. As a result of CACIB's wrongful actions, Ruiz is entitled to recover actual damages and punitive damages, plus attorneys' fees and interest, in an amount to be proven at trial, but no less than $1,000,000.

## SECOND CAUSE OF ACTION
## AGAINST DEFENDANTS CACIB AND BOTTING
(Unlawful Employment Discrimination & Retaliation in Violation of NYSHRL)

61. Plaintiff Ruiz repeats and realleges each and every allegation contained in paragraphs 1 through 60 of this Complaint.

62. The NYSHRL prohibits, among other things, discharging, retaliating against, or otherwise discriminating against an employee based on his race, color, or national origin.

63. Starting in 2015, CACIB and Botting initiated a continuing campaign of discrimination against Ruiz in the terms and condition of his employment based on his race, color, and national origin, which continued through his wrongful termination in May 2020.

64. Moreover, during this period, CACIB and Botting created an intimidating, hostile, and offensive work environment for Ruiz, based on his race, color, and national origin, through discriminatory comments, adverse actions, and practices.

65. CACIB and Botting also unlawfully retaliated against Ruiz for reporting and complaining of CACIB's discrimination and hostile work environment.

66. These actions, taken singly and in their entirety, constitute unlawful discrimination in violation of the NYSHRL.

67. CACIB's and Botting's conduct was malicious, wanton, and reckless or in willful disregard for Ruiz's rights, and continued a pattern of discrimination by and at CACIB directed towards non-Caucasian employees.

68. As a direct, proximate, and foreseeable cause of CACIB's and Botting's NYSHRL violations, Ruiz suffered humiliation, embarrassment, mental and emotional discomfort, damage to his reputation and economic opportunities, and loss of wages, other compensation, and benefits.

69. As a further proximate result of CACIB's and Botting's unlawful employment practices, Ruiz has had to incur attorneys' fees, costs, and incidental expenses.

70. As a result of CACIB's and Botting's wrongful actions, Ruiz is entitled to recover actual damages and punitive damages, plus attorneys' fees and interest, in an amount to be proven at trial, but no less than $1,000,000.

**THIRD CAUSE OF ACTION
AGAINST DEFENDANTS CACIB AND BOTTING**
**(Unlawful Employment Discrimination & Retaliation in Violation of NYCHRL)**

71. Plaintiff Ruiz repeats and realleges each and every allegation contained in paragraphs 1 through 70 of this Complaint.

72. The NYCHRL prohibits, among other things, discharging, retaliating against, or otherwise discriminating against an employee based on his race, color, or national origin.

73. Starting in 2015, CACIB and Botting initiated a continuing campaign of discrimination against Ruiz in the terms and condition of his employment based on his race, color, and national origin, which continued through his wrongful termination in May 2020.

74. Moreover, during this period of time, CACIB and Botting created an intimidating, hostile, and offensive work environment for Ruiz, based on his race, color, and national origin, through discriminatory comments, adverse actions, and practices.

75. CACIB and Botting also unlawfully retaliated against Ruiz for reporting and complaining of CACIB's discrimination and hostile work environment.

76. These actions, taken singly and in their entirety, constitute unlawful discrimination

in violation of the NYCHRL.

77. CACIB's and Botting's conduct was malicious, wanton, and reckless or in willful disregard for Ruiz's rights, and continued a pattern of discrimination by and at CACIB directed towards non-Caucasian employees.

78. As a direct, proximate, and foreseeable cause of CACIB's and Botting's NYCHRL violations, Ruiz suffered humiliation, embarrassment, mental and emotional discomfort, damage to his reputation and economic opportunities, and loss of wages, other compensation, and benefits.

79. As a further proximate result of CACIB's and Botting's unlawful employment practices, Ruiz has had to incur attorneys' fees, costs, and incidental expenses.

80. As a result of CACIB's and Botting's wrongful actions, Ruiz is entitled to recover actual damages and punitive damages, plus attorneys' fees and interest, in an amount to be proven at trial, but no less than $1,000,000.

## DEMAND FOR RELIEF

WHEREFORE, plaintiff Ruiz demands judgment against defendants CACIB and Botting, as follows:

a) finding that CACIB and Botting, as set forth herein, discriminated and retaliated against Ruiz in violation, as applicable respectively, of Title VII, the NYSHRL, and the NYCHRL;

b) awarding Ruiz compensatory monetary damages under applicable law, in an amount to be determined at trial;

c) awarding Ruiz punitive damages under applicable law, in an amount to be determined at trial;

d) awarding Ruiz the costs of this action, together with reasonable attorneys' fees as

provided under applicable law, in an amount to be determined at trial;

e) awarding Ruiz pre-judgment and post-judgment interest as provided by law; and

f) awarding Ruiz such other and further relief as the Court deems necessary and proper.

## JURY DEMAND

Plaintiff Ruiz hereby demands a trial by jury of all issues so triable.

Dated: New York, New York
December 21, 2022

REAVIS PAGE JUMP LLP

By: _____

Alice K. Jump
Jill Kahn Marshall
Gregory P. Feit
41 Madison Avenue, 41st Floor
New York, New York 10010
Tel.: (212) 763-4100
ajump@rpjlaw.com
jmarshall@rpjlaw.com
gfeit@rpjlaw.com

*Attorneys for Plaintiff José Ruiz*