UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                                    :
JOSÉ RUIZ,                                          :
                                                    :
                              Plaintiff,            :
                                                    :          22-CV-10777 (VSB) (BCM)
               - against -                          :
                                                    :          **<u>OPINION & ORDER</u>**
CREDIT AGRICOLE CORPORATE AND                       :
INVESTMENT BANK; ANTHONY                            :
BOTTING,                                            :
                                                    :
                              Defendants.           :
                                                    :
---------------------------------------------------------X

<u>Appearances</u>:

Gregory Phillip Feit
Alice Keeney Jump
Reavis Page Jump LLP
New York, NY
*Counsel for Plaintiff*

Barbara M. Roth
Anastasia A Regne
Tyler Thomas Hendry
Herbert Smith Freehills New York LLP
New York, NY
*Counsel for Defendant Credit Agricole Corporate and Investment Bank*

David Brian Wechsler
Daniel Barnett Grossman
Joseph Terence Gallagher
Harris St. Laurent & Wechsler LLP
New York, NY
*Counsel for Defendant Anthony Botting*

<u>VERNON S. BRODERICK</u>, United States District Judge:

        Plaintiff José Ruiz ("Ruiz") was an employee at Defendant Crédit Agricole Corporate and

Investment Bank ("Crédit Agricole" or the "Bank"). Ruiz alleges that Defendant Keith Botting

("Botting")—at times his supervisor at the Bank—and other Bank employees racially discriminated against him during his employment.  Ruiz asserts causes of action for disparate treatment, hostile work environment, and retaliation against Botting personally under the New York State Human Rights Law ("NYSHRL" or "State HRL"), N.Y. Exec. Law § 290, and the New York City Human Rights Law ("NYCHRL" or "City HRL"), N.Y.C. Admin. Code § 8-107. Ruiz also asserts causes of action against the Bank that are not at issue for purposes of this Opinion & Order.

Before me is Botting's motion to dismiss Ruiz's causes of action for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and for failure to state a claim under Rule 12(b)(6).  Because I find that personal jurisdiction over Botting exists, his Rule 12(b)(2) motion is DENIED.  However, I find that Botting was not an "employer" against whom the State HRL authorizes suit, so Botting's motion to dismiss Ruiz's State HRL claim under Rule 12(b)(6) is GRANTED.  Finally, because I find that Ruiz plausibly alleges causes of action for disparate-treatment, hostile-work-environment, and retaliation under the NYCHRL, Botting's Rule 12(b)(6) motion is DENIED as to these causes of action.  In sum, the Rule 12(b)(6) motion is GRANTED IN PART and DENIED IN PART.

## I.    **Factual Background**[1]

Plaintiff José Ruiz is a former employee of Defendant Crédit Agricole Corporate and Investment Bank ("Crédit Agricole," or the "Bank").  (Doc. 1 ("Compl.") ¶¶ 6.)  Ruiz describes himself as a "non-White Latinx male," born in the United States "of Peruvian heritage."  (*Id.* ¶ 12.)  Ruiz graduated from Dartmouth College, received his MBA from UCLA, and after six

---

[1] I draw these facts from Plaintiff's complaint, and assume they are true for the purposes of the motion to dismiss under Rule 12(b)(6).  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  My recitation of these facts does not constitute factual findings and should not be construed as such.

years in the financial services industry began working for Crédit Agricole "at the Director level and has Head of the [Foreign Exchange ("FX")] Trading Desk for the Americas" in 2010. (*Id.* ¶¶ 14–15.) In 2014, the Bank promoted him to "Managing Director." (*Id.* ¶ 17.) In 2015, the Bank promoted him again to "Head of Emerging Market [("EM")] Trading for FX, Interest Rate Derivatives, and Credit." (*Id.* ¶ 18.) Ruiz alleges that EM "is generally one of the few areas in global financial firms where Latinx people are hired at or promoted to senior positions." (*Id.*)

Following Ruiz's 2015 promotion, Defendant Keith Botting became one of his supervisors. (Compl. ¶ 19.) Botting worked at the Bank's London office, and Ruiz "worked under or in close connection with him" from the Bank's New York office. (*Id.*, *see* Doc. 29 ("Ruiz Decl.) ¶¶ 2, 5.[2]) Ruiz alleges that Botting "consistently and routinely treated" him and his nonwhite colleagues "disrespectfully." (Compl. ¶ 20.) For instance, during a work dinner in fall 2015, Botting "publicly humiliated Ruiz" in front of his "managers and colleagues" by "suggesting that Ruiz did not know how to trade Emerging Markets FX and denigrating him for having not worked at a large bank." (*Id.* ¶ 21.) "Ruiz's colleagues came up to him afterward to comment that they had never seen such behavior and to compliment him for defending himself against Botting's unwarranted abuse." (*Id.*) After the incident, the Bank's "reporting structure changed" such that Ruiz had fewer interactions with Botting, but Botting continued to "address[] Ruiz in a disrespectful and demeaning manner" when the two did interact. (*Id.* ¶ 22.)

In 2017, Ruiz again became one of Botting's direct reports. (Compl. ¶ 23.) Botting began "micromanaging Ruiz" because of "disagreements," and Botting "frequently berated him over the phone with criticisms over minor issues" and "bombarded Ruiz with negative emails."

---

[2] I reference Ruiz's declaration, which describes how Botting directed certain actions from London to New York, solely for purpose of resolving Botting's motion to dismiss for lack of personal jurisdiction. A court may properly consider extrinsic evidence in considering such a motion. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

(*Id.*)  After two new white traders began working for Botting, Botting reassigned "Asia trading desk" responsibilities from Ruiz to one of the white traders, and told Ruiz that he should "emulate" the newly hired white traders.  (*Id.* ¶¶ 24–25.)  Neither of the white traders succeeded at the Bank and left the firm "within a year or so."  (*Id.* ¶ 25.)

In October 2018, Ruiz "reluctant[ly]" reported "Botting's abuse" to an individual in the Bank's Human Resources department ("HR"), "[b]ut Human Resources concluded that it was merely a 'style issue.'"  (Compl. ¶ 26.)  Ruiz had been reluctant to report Botting's actions because he "feared that he would be blackballed within the Bank and in the industry for raising the issue" of Botting's "discrimination."  (*Id.*)  Indeed, after Ruiz's conversation with HR, the Bank's "Head of Sales and Trading [] approached Ruiz to see if he would be willing to accept a severance package to leave [the Bank], since Botting was unlikely to be terminated."  (*Id.* ¶ 27.)  "Ruiz rejected [the] offer, as he enjoyed his work and hoped the situation with Botting would improve."  (*Id.*)

In November 2018, Ruiz—believing he had the authority to do so—suspended a client's trading privileges for certain FX transactions because of the client's "history of predatory trading on prices that did not reflect actual market pricing."  (Compl. ¶ 35.)  He "immediately notified" Botting and the client's account manager, who did not intervene.  (*Id.*)  The following week, after the client "threatened to take business away" from the Bank, Ruiz restored the client's trading privileges.  (*Id.*)  Ruiz received a "warning" from the Bank for the incident, even though one manager told Ruiz that he believed Ruiz "had been treated unfairly," and another manager "admitted" that "he had found no evidence that Ruiz had violated any established policy or guidelines."  (*Id.* ¶ 36.)

4

Ruiz had a performance review in late 2018 following his report of Botting's behavior to HR.[3] (Compl. ¶ 28.) Ruiz's 2018 performance review, "for the first time in his career" at the Bank, was "negative," and the $160,000 bonus he received that year was less than the bonuses that he had received in previous years, which ranged from $290,000 to $320,000. (*Id.*) In Ruiz's declaration—but not in the complaint—he alleges that Botting "wrote [his] year-end reviews." (Ruiz Decl. ¶ 11.)

In February 2019, Ruiz met with another of his supervisors, explaining in the meeting "that he believed Botting's mistreatment of him was racially motivated." (Compl. ¶ 37.) The supervisor "acknowledged that Botting's behavior toward Ruiz was unacceptable and said that Botting would receive a strong warning. But Ruiz never received any follow-up from [the Bank] about any such warning to Botting, so he is unaware whether any action was ever taken." (*Id.*) Ruiz also met with HR in February 2019, raising his concerns about "Botting's conduct" and expressing his belief that "he and other non-White employees were being mistreated due to race or national origin." (*Id.* ¶ 38.) Ruiz told HR that because of Botting's "discrimination, he had been unfairly disciplined for the [client-suspension] incident and improperly accused of violating a procedure that did not even exist." (*Id.*) After this meeting with HR, Ruiz "was ostracized by his colleagues and managers, who stopped inviting him to management meetings, [] team dinners, and outings." (*Id.* ¶ 39.)

Botting also "protect[ed] underperforming White traders while attacking minority traders" other than Ruiz. (Compl. ¶ 28.) Once, "Botting told everyone on the desk" that "a Hispanic trader" was "a terrible trader and could only make easy money." (*Id.*) "Botting also repeatedly insulted . . . an older Black trader," falsely criticizing his trading performance in 2019,

---

[3] It is unclear if Ruiz's review occurred before or after his disciplinary warning.

and frequently told a coworker that he wanted to fire the trader.  (*Id*.)  Ruiz further alleges that Botting supervised an employee (the "Subordinate") who asked a "Hispanic" trader to "get him breakfast every morning."  (*Id*. ¶ 31.)  Botting's Subordinate also paid a white new-hire trader more than an experienced black trader.  (*Id*.)  When Botting's Subordinate heard other traders on the floor joking to Ruiz "that all Peruvians are gardeners or perform manual labor" and making fun of "Spanish food," the Subordinate chimed in to discuss his "'favorite' racist jokes."  (*Id*. ¶ 34.)

Ruiz also emphasizes that a nonwhite employee of the Bank in London successfully sued Botting in the United Kingdom; the court "concluded that Botting's remarks about the claimant and 'Asian people' constituted inappropriate stereotyping on racial grounds, and was 'satisfied' based on the evidence presented 'that a white Caucasian would not have been subjected to the same negative stereotyping.'"  (*Id*. ¶ 32.)

Ruiz was also unfairly treated by other employees between approximately February 2019 and May 2020, (*see generally* Compl. ¶¶ 40–46), when the Bank terminated his employment "for purported communication issues," (*id*. ¶ 46).   Ruiz filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and with New York employment authorities based on the foregoing allegations on March 8, 2021.  (Compl. ¶ 49.) The EEOC issued a right-to-sue letter on September 29, 2022.  (*Id*. ¶ 50.)

## II.    <u>Procedural History</u>

Ruiz filed the instant complaint on December 21, 2022, alleging, among other things, disparate-treatment, hostile-work-environment, and retaliation causes of action against Botting and the Bank under the NYSHRL and NYCHRL.  (*See id*. ¶¶ 61–80.)  Ruiz also asserts Title VII claims against the Bank.  (*See id*. ¶¶ 51–80.)  The Bank answered Ruiz's complaint on March 15,

2023, (Doc. 13); discovery as to Ruiz's claims against the Bank is ongoing, (*see* Docs. 33, 41, 43).

In lieu of filing an answer, on May 10, 2023, Botting filed the instant motion to dismiss Ruiz's causes of action, (Doc. 21), and an accompanying memorandum of law, (Doc. 22 ("Mem.")).  Ruiz filed his opposition brief on June 30, 2023, (Doc. 28 ("Opp'n")), and filed a declaration, (Doc. 29 ("Ruiz Decl.")), in response to Botting's argument that this Court lacks personal jurisdiction over him.  Botting replied on July 21, 2023, (Doc. 30 ("Reply")).

### III.  <u>Legal Standards</u>

Botting moves to dismiss Ruiz's causes of action under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  (*See* Doc. 21.)

#### A.  *Rule 12(b)(2): Failure to Establish Personal Jurisdiction*

Upon a defendant's "motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing personal jurisdiction."  *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 349 (S.D.N.Y. 2014) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)).  At this preliminary stage, the plaintiff only needs to make a "prima facie showing" of jurisdiction, which "may be established solely by allegations."  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  In deciding the motion, a court may look beyond the pleadings to affidavits and other supporting materials, which are construed in the light most favorable to the plaintiff.  *See Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).

### B. *Rule 12(b)(6): Failure to State a Claim*

"A motion to dismiss" for failure to state a claim "is designed to test the legal sufficiency of the complaint." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) (internal quotation marks omitted).  To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The court takes the well-pled facts in the complaint as true, draws all reasonable inferences in the plaintiff's favor, and ignores any "legal conclusions" among the factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Dismissal is proper when "the allegations in a complaint, however true, could not raise a claim of entitlement to relief" as a matter of law. *Twombly*, 550 U.S. at 558.

## IV.    <u>Discussion</u>

Ruiz asserts causes of action for disparate-treatment, hostile-work-environment, and retaliation against Botting under the NYSHRL, N.Y. Exec. L. § 296, and the NYCHRL, N.Y.C. Admin. Code § 8–107.  (*See* Compl. ¶¶ 61–80.)  Ruiz's allegations as to Botting relate to conduct that occurred prior to the October 11, 2019 effective date of the New York legislature's amendment of the State HRL; therefore, I apply the pre-amendment version of the law.  *See Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 274 (S.D.N.Y. 2024) (explaining that "on August 19, 2019, the New York legislature amended the NYSHRL," with an "effective date of October 11, 2019").  For the reasons that follow, I find that (1) there is personal jurisdiction over Botting; (2) Ruiz cannot assert a claim against Botting under the NYSHRL because Botting is not an "employer" within the meaning of the NYSHRL; (3) Ruiz's claims are timely; (4) Ruiz has stated a disparate-treatment claim against Botting under the NYCHRL regarding the reassignment of certain responsibilities; (5) Ruiz states a hostile-work-environment claim against

Botting under the NYCHRL; and (6) Ruiz states an NYCHRL retaliation claim against Botting regarding adverse actions Ruiz allegedly experienced in late 2018.  I address each of these issues in turn below.

### A.  *Personal Jurisdiction*

When, as here, a district court's original jurisdiction over a case is based on a federal question,[4] the court evaluates the personal jurisdiction of non-domiciliaries such as Botting based on the laws of the forum state.  *See Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Ruiz asserts that this Court has personal jurisdiction over Botting pursuant to New York's long-arm statute, which authorizes courts to exercise personal jurisdiction over a non-domiciliary that "transacts any business within the state or contracts anywhere to supply goods or services in the state."  N.Y. C.P.L.R. § 302(a)(1).  *See also Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 358 (S.D.N.Y. 2007).

Section 302(a)(1) permits "courts to exercise jurisdiction over non-domiciliaries who transact any business within the state, provided that the transactions are purposeful and that there is a substantial relationship between the transactions and the claims being asserted against the non-domiciliaries."  *Williams v. Preeminent Protective Servs., Inc.*, 81 F. Supp. 3d 265, 271 (E.D.N.Y. 2015) (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)).  Here, Botting's supervisory relationship with Ruiz from the Bank's London office to its New York office is the type of transactional relationship that confers personal jurisdiction under the statute. Ruiz explains that the dinner at which Botting made allegedly discriminatory comments occurred in New York City, which is "a single, purposeful transaction" that confers personal jurisdiction.

---

[4] Even though Ruiz asserts only state-law claims against Botting, he invokes this Court's original subject-matter jurisdiction over his Title-VII claims against the Bank, *see* 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over his state-law claims.  (*See* Compl. ¶ 9.)

*Int'l Healthcare Exch.*, 470 F. Supp. 2d at 358.  Moreover, when Botting was in London, he purposefully directed his allegedly discriminatory actions as Ruiz's supervisor at New York by calling and sending Bloomberg terminal messages to Ruiz in the state nearly every day.  (Ruiz Decl. ¶¶ 6, 8.)  As multiple courts have concluded, an out-of-state or out-of-country supervisor subjects himself to the personal jurisdiction of New York courts under N.Y. C.P.L.R. § 302(a)(1) by regularly directing allegedly discriminatory workplace conduct at an employee physically present in New York.  *See, e.g.*, *Int'l Healthcare Exch.*, 470 F. Supp. 2d at 358–59; *Baskett v. Autonomous Rsch. LLP*, No. 17-CV-9237, 2018 WL 4757962, at *11 (S.D.N.Y. Sept. 28, 2018); *Kumar v. Opera Sols. OPCO, LLC*, No. 20-CV-6824, 2021 WL 4442832, at *8–9 (S.D.N.Y. Sept. 28, 2021); *D'Anzieri v. Harrison Glob. LLC*, No. 21-CV-8506, 2022 WL 17404254, at *7 (S.D.N.Y. Dec. 2, 2022).

Botting, citing *Scott v. ProClaim Am., Inc.*, 14-CV-06003, 2015 WL 3851243, at *4 (E.D.N.Y. June 22, 2015), argues that his contacts with New York are not related to Ruiz's "core discrimination allegations against the Bank."  (Reply at 9.)  In *Scott*, the plaintiff, a New-York resident, asserted disability-discrimination and retaliatory-discharge claims against his supervisors in Texas.  2015 WL 3851243, at *1.  In unsuccessfully asserting the court's personal jurisdiction over these out-of-state defendants, the plaintiff identified only the defendants' replies to a handful of his emails notifying them of his inability to work because of a medical condition.  *Id*. at *3–4.  Here, however, Botting's communication with Ruiz at the dinner in New York and Botting's continuous email and instant-message communications directed at Ruiz in New York is the conduct that Ruiz claims is discriminatory.  Botting argues that the conduct is nonetheless insufficient to establish the Court's personal jurisdiction because Ruiz's allegations are "conclusory," (Mem. at 19), and Ruiz does not "explain[]" how the conduct is "discriminatory."

(Reply at 9.)  However, whether Ruiz's allegations are sufficient to state a claim of discrimination is a separate question from whether Ruiz's allegations support jurisdiction.  Ruiz alleges that Botting directed his conduct from the Bank's London office towards Ruiz in the Bank's New York office.  These allegations suffice as a "prima facie showing" of jurisdiction.

Botting's motion to dismiss for lack of personal jurisdiction is DENIED.

## B.  *Whether Botting is an NYSHRL "Employer"*

Turning to the motion to dismiss for failure to state a claim, Botting asserts that the NYSHRL's antidiscrimination and antiretaliation provisions, N.Y. Exec. L. § 296(1)(a) and (1)(e), do not apply to him as a Bank employee.  I agree.  The statute prohibits "an employer" from discriminating against an employee because of the employee's protected characteristic, *id*. § 296(1)(a), or because the employee "has opposed any" discriminatory practice, *id*. § 296(1)(e). The New York Court of Appeals has held that a "corporate employee" is not an "employer" within the meaning of the NYSHRL and therefore "is not individually subject to suit" under the statute.  *Patrowich v. Chem. Bank*, 473 N.E.2d 11, 12 (N.Y. 1984); *accord Doe v. Bloomberg, L.P.*, 167 N.E.3d 454, 459 (N.Y. 2021).  Botting, as an employee of the Bank, is not an employer under the NYSHRL, so Ruiz's claims against him under the NYSHRL fail.

It is true, as Plaintiff points out, that the NYSHRL supports employee liability in certain circumstances.  (*See* Opp'n 17–18.)  Specifically, the statute makes it unlawful "for any person to aid, abet, incite, compel or coerce" activity otherwise prohibited under the statute.  N.Y. Exec. L. § 296(6).  The Second Circuit has interpreted this provision to support a claim of aiding-and-abetting liability against a non-employer "who actually participates in the conduct giving rise to a discrimination claim."  *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995); *see also Feingold v. New York*, 366 F.3d 138, 157–58 (2d Cir. 2004).  Here, Plaintiff does not assert an

aiding-and-abetting claim against Botting, he alleges that Botting is individually liable under the NYSHRL for discrimination and retaliation.  (Compl. ¶¶ 63–65.)  The law is clear that "an individual cannot aid and abet his or her own violation of the statute."  *Baptiste v. City Univ. of N.Y.*, 680 F. Supp. 3d 415, 427 (S.D.N.Y. 2023) (internal quotation marks omitted).

Therefore, Botting's motion to dismiss Ruiz's NYSHRL is GRANTED.

### C.   *Timeliness*

I next address whether Ruiz's claims against Botting are timely.  "NYSHRL and NYCHRL each have three-year statute of limitations periods."  *Siddiqi v. N.Y. City Health Hosps. Corp.*, 572 F. Supp. 2d 353, 373 (S.D.N.Y. 2008) (citing N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d)).  The parties agree that considering the three-year limitations period and the applicable tolling provisions,[5] the earliest date on which an NYSHRL or NYCHRL claim can have accrued in this action is October 13, 2017.  (Mem. 8; Opp'n 14.)

An NYSHRL or NYCHRL workplace-discrimination claim accrues "on the date of the alleged discriminatory act."  *Lee*, 751 F. Supp. 3d at 275 (quoting *Fair Hous. Just. Ctr., Inc. v. JDS Dev. LLC*, 443 F. Supp. 3d 494, 504 (S.D.N.Y. 2020)).  For a disparate-treatment claim, the date of the discriminatory act is "the date that an adverse employment determination is made and communicated to the plaintiff."  *Milani v. Int'l Bus. Machines Corp.*, 322 F. Supp. 2d 434, 451 (S.D.N.Y. 2004) (internal quotation marks omitted).  The date that a hostile-work-environment claim accrues is slightly more complicated because the "very nature" of such a claim "involves repeated conduct," and "the unlawful employment practice therefore cannot be said to occur on any particular day."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (internal

---

[5] The limitations period was tolled during the pendency of an EEOC complaint, *see, e.g.*, *Ortiz v. Metro. Transp. Auth.*, No. 13-CV-1033, 2014 WL 11460929, at *15 (S.D.N.Y. Sept. 30, 2014), *aff'd*, 615 F. App'x 702 (2d Cir. 2015), and by various COVID-19 executive orders, *see, e.g.*, *Felice v. Westpark Cap., Inc.*, No. 23-CV-10138, 2024 WL 4349482, at *12 (S.D.N.Y. Sept. 30, 2024).

quotation marks omitted).  Given the nature of the conduct underlying a hostile-work-environment claim, courts consider such a claim to be timely so long as "an act contributing to the claim occur[ed] within the filing period."  *Id*. at 117.  Courts apply this so-called "continuing-violation doctrine" to "claims under the NYCHRL and the NYSHRL."  *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011).

Conduct alleged to have occurred before October 13, 2017 may support only Ruiz's hostile-work-environment claim; any disparate-treatment claim based on conduct prior to that date is time-barred.  However, one incident warrants further discussion.  Specifically, Ruiz asserts a disparate-treatment claim based on the allegation that, "[i]n 2017," Botting took the "Asia trading desk" responsibilities from Ruiz and reassigned them to a worse-performing white trader.  (Compl. ¶¶ 24–25.)  The complaint does not allege whether this incident occurred before or after the relevant date of October 13, 2017.  That said, the statute of limitations is an affirmative defense on which the defendant bears the burden of proof, and I may grant a motion to dismiss on statute-of-limitations grounds "only if it is clear that the claim is untimely on the face of the complaint."  *Miller v. Hyundai Motor Am.*, No. 15-CV-4722, 2016 WL 5476000, at *5 (S.D.N.Y. Sept. 28, 2016) (citing *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999); *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004)).  Plaintiff's imprecise pleading with regard to the timing of Botting taking responsibilities from Ruiz makes it unclear whether a claim based on this incident is timely, so I decline to dismiss on timeliness grounds.

Therefore, Botting's motion to dismiss with regard to this claim is DENIED as to this incident.

### D. *Disparate Treatment*

I next address whether Ruiz states a claim against Botting for disparate treatment under the NYCHRL.[6]  For a disparate-treatment claim under the NYCHRL to survive a motion to dismiss, a plaintiff must "establish that []he was subject to an unfavorable employment change or treated less well than other employees on the basis of a protected characteristic." *Baptiste*, 680 F. Supp. 3d at 422 (alteration adopted) (quoting *Ayers v. Bloomberg, L.P.*, 165 N.Y.S.3d 554, 557 (2d Dep't 2022)).  This requires a plaintiff to "allege facts supporting an inference of discrimination." *Id*. (citing *Cooper v. Franklin Templeton Invs.*, No. 22-2763-CV, 2023 WL 3882977, at *3 (2d Cir. June 8, 2023)).  "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (internal quotation marks omitted).  Replacing an "employee with an individual outside the employee's protected class" may also raise an inference of discrimination.  *Id*. at 312–13.

Ruiz argues that it was discriminatory under the NYCHRL for Botting to shift "Asia trading desk" responsibilities from Ruiz to a white trader.  (*See* Compl. ¶¶ 24–25.)  Botting contends that this action is insufficiently "adverse" to be an adverse employment action under the statutes.  (Mem. 12.)  However, Ruiz's complaint describes a workplace where bonus compensation is tied to an employee's sales, so it is plausible that taking away this responsibility

---

[6] Because I have disposed of Plaintiff's NYSHRL claims, *see supra* § IV.B., I do not analyze the merits here, although the analysis is similar.  I draw on Title VII and NYSHRL cases because given the lower standard of the NYCHRL, "to the extent that a plaintiff states a claim under Title VII and the NYSHRL, she . . . necessarily states a claim under the NYCHRL." *Taylor v. City of New York*, 207 F. Supp. 3d 293, 304 (S.D.N.Y. 2016).

from Ruiz could have embarrassed him and reduced his total compensation by reducing his opportunity to make sales. *See Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, 745 F. Supp. 3d 68, 90–91 (S.D.N.Y. Aug. 16, 2024) (explaining that, under recent Supreme Court precedent, the "loss of job responsibilities" is an adverse employment action (citing, *inter alia*, *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–56 (2024))). Although Botting attempts to argue that Ruiz's disciplinary warning shows he was not "competent" at his job, *Baptiste*, 680 F. Supp. 3d at 421, the warning occurred over a year after the reassignment of Ruiz's duties, (*see* Compl. ¶¶ 24–25, 35), so it is irrelevant to this particular adverse action.

Further, Ruiz has alleged facts which, at this early stage of the litigation, raise a "minimal inference" of discrimination. *Littlejohn*, 795 F.3d at 311. Ruiz points out that when the two white traders were hired by Botting to work him, Botting told Ruiz (referring to the new hires): "This is what trading managers look like – you need to emulate them." (Compl. ¶ 25.) Here, it can be inferred that Botting was referring to the white traders' appearance. In contrast to Botting's statement, neither trader succeeded at the Bank and both left after barely a year. (*Id.*) Yet Botting shifted Ruiz's responsibilities to one of them anyway. (*Id.* ¶¶ 24–25.) Botting's comments followed by the reassignment of duties from Ruiz to a non-protected and lesser-qualified employee raise an inference of discrimination. *See Palmer v. eCapital Corp.*, No. 23-CV-4080, 2024 WL 3794715, at *8 (S.D.N.Y. Aug. 13, 2024) (citing *Littlejohn*, 795 F.3d at 312–13). More specifically with regard to Botting's comment that the white traders are "what trading managers look like," (Compl. ¶ 25), this may well also have been a veiled "criticism of [Ruiz's] performance in ethnically degrading terms," *Littlejohn*, 795 F.3d at 312.

Therefore, Botting's motion to dismiss this claim is DENIED.

Ruiz also alleges that his 2018 negative performance review, his disciplinary warning, his bonus reductions, and his 2020 termination are all connected to Botting's discrimination.  (*See* Compl. ¶¶ 28, 36, 37–38, 41–42, 45–48.)  However, Ruiz alleges that these negative reviews began "following his report to Human Resources," (*id*. ¶ 28), so they more appropriately fit within his retaliation claim, not his disparate-treatment claim, *cf. Baptiste*, 680 F. Supp. 3d at 423 (explaining that a defendant's "supposed anger at [the plaintiff] for complaining about racial discrimination . . . is not enough to support an inference of discrimination, as opposed to retaliation").

### E.  *Hostile Work Environment*

I turn next to Plaintiff's claim under the NYCHRL that Botting created a hostile work environment.  Under the NYCHRL, to state a hostile work environment claim, Ruiz need only show he was "treated less well than other employees because of his protected status."  *Mitchell*, 745 F. Supp. 3d at 106 (alteration adopted) (quoting *Chin v. N.Y.C. Hous. Auth.*, 965 N.Y.S.2d 42, 44 (1st Dep't 2013)).  However, the "conduct alleged must exceed what a reasonable victim of discrimination would consider petty slights and mere inconveniences, and mere personality conflicts will not suffice to establish a hostile work environment" under the NYCHRL.  *Id*. (quoting *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 245 (2d Dep't 2021) (alteration adopted)).  Under the NYCHRL, the plaintiff need only demonstrate that the poor treatment he experienced occurred "at least in part for a discriminatory reason."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013).

I conclude that Ruiz's NYCHRL hostile-work-environment claim survives Botting's motion to dismiss.  Ruiz alleges that beginning at the 2015 dinner, and at nearly every subsequent opportunity, Botting subjected him to relentless and consistent hostility and criticism.

16

When Botting was Ruiz's direct supervisor, he frequently called, emailed, and instant-messaged Ruiz to "berat[e] him . . . with criticisms over minor issues." (Compl. ¶ 23.) According to Ruiz, Botting's treatment of him was so bad that once his coworkers told him that "they had never seen such behavior," (*id*. ¶ 21), and a supervisor told Ruiz that Botting's behavior was so "unacceptable" that he "would receive a strong warning," (*id*. ¶ 37). Viewing Ruiz's complaint in his favor and at this early stage of the case, it is reasonable to infer that Botting's frequent and intense mistreatment of him went beyond "petty slights and trivial inconveniences" and transformed his workplace into an abusive environment. *Mitchell*, 745 F. Supp. 3d at 106 (internal quotation marks omitted). Additionally, Botting's potentially-race-related reassignment of Ruiz's trading responsibilities, (*see* Compl. ¶¶ 24–25), his unwarranted praise of white employees and criticisms of nonwhite employees, (*see id.* ¶ 30), and his tacit acceptance of his subordinate's racist comments, (*see id*. ¶ 34)—in the "more relaxed" NYCHRL context—suffice to suggest that Botting's treatment of Ruiz was at least in part racially motivated. *Lee*, 751 F. Supp. 3d at 287 (citing *Bermudez*, 783 F. Supp. 2d at 579). Thus, Ruiz states a hostile-work-environment claim against Botting under the NYCHRL.

Because I have concluded that the NYSHRL does not support Ruiz's cause of action against Botting because he is not an employer, I need not opine on Ruiz's hostile-work-environment claim under that statute. *See supra* § IV.B.

### F. *Retaliation*

Ruiz also asserts retaliation claims against Botting under the NYCHRL.[7] (*See* Compl. ¶¶ 61–80.) To state a retaliation claim under the NYCHRL, a plaintiff must plausibly allege

---

[7] Because I have dismissed Plaintiff's NYSHRL claims, *see supra* § IV.B., I do not address Plaintiff's retaliation claim under the NYSHRL.

"[]he took an action opposing [his] employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Lee*, 751 F. Supp. 3d at 284 (alteration adopted) (quoting *Mihalik*, 715 F.3d at 112).  The plaintiff must also show that the protected activity was a "motivating factor" in the adverse action.  *Id*. (internal quotation marks omitted).

Ruiz alleges that following his October 2018 report of Botting's behavior to HR department, he was asked if he would be willing to accept a severance package to leave the Bank, received an allegedly "unfair" disciplinary warning, and then received an allegedly unwarranted poor performance review, and a bonus that was between $130,000 and $160,000 lower than in previous years.  (*See* Compl. ¶¶ 26–28, 35–36.)  These allegations support a retaliation claim against Botting.  First, Ruiz's report to HR is a protected activity.  *See Ziccarelli v. NYU Hosps. Ctr.*, No. 15-CV-9307, 2021 WL 797668, at *9 (S.D.N.Y. Feb. 27, 2021) (collecting cases).  Second, Ruiz (1) was asked if he would be willing to accept a severance package to leave the Bank, (2) received a disciplinary warning, (3) was given a negative performance review, and (4) received a bonus reduction, which actions are all "reasonably likely to deter a person" from engaging in protected activity.  *Lee*, 751 F. Supp. 3d at 284 (quoting *Mihalik*, 715 F.3d at 112); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 92 (2d Cir. 2015) ("[O]f course, a poor performance evaluation could very well deter a reasonable worker from complaining.").  Third, it is reasonable to infer for purposes of this motion that Botting knew about Ruiz's protected activity because as Ruiz's supervisor at this time he was presumably responsible for his negative and unprecedented performance review, another supervisor learned of Ruiz's protected activity, and HR admittedly informed Botting about Ruiz's subsequent complaint about him.  (*See* Compl. ¶¶ 26–28, 37.)  *Cf. Colon v. N.Y.C. Hous. Auth.*,

No. 16-CV-4540, 2021 WL 2159758, at *17 (S.D.N.Y. May 26, 2021) (explaining that "a jury 'can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities' provided there is circumstantial evidence allowing the jury to infer knowledge by other means" (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)); *see also id.* ("[A] plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case." (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013)).  Fourth, the two-months' temporal proximity between Ruiz's complaint and the adverse actions is sufficient temporal proximity to raise a causal inference of discrimination.  *See Specht v. City of New York*, 15 F.4th 594, 605 (2d Cir. 2021) (concluding that five months between protected conduct was "sufficient to permit an inference of causation").

As Botting points out, however, (*see* Mem. at 13), the complaint contains no allegations that support an inference that Botting participated in the adverse conduct Plaintiff experienced after February 2019.  Instead, the complaint contains allegations that Ruiz was being "set up to fail" on the "LatAm FX desk," (Compl. ¶ 40), being berated in January 2020, (*id*. ¶ 41), received another relatively low bonus in February 2020, (*id*. ¶ 42), experienced another disciplinary incident in March 2020, (*id*. ¶ 43–44), and had his employment terminated by the Bank, (*id*. ¶¶ 45–48).  Botting was not Ruiz's supervisor at this time, as Ruiz received a new supervisor in December 2018.  (*See* Compl. ¶ 33.)  Ruiz does not argue or assert facts to suggest that Botting was responsible for these later adverse actions under a theory of "'cat's paw' liability," nor does he provide any factual assertions to support such a theory.  *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016).[8]

---

[8] "[T]he 'cat's paw' metaphor . . . 'refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action.'"  *Vasquez*, 835 F.3d at 272 (quoting *Cook v. IPC Intern. Corp.*, 673 F.3d 625, 628 (7th Cir. 2012)).

Ruiz has stated a claim for retaliation against Botting in connection with the events that allegedly occurred between October and December 2018, before he left Botting's supervision. The motion to dismiss this portion of Ruiz's retaliation claim asserted under the NYCHRL is DENIED, and the motion to dismiss the remaining portion of the retaliation claim is GRANTED.

## V.    **Conclusion**

For the foregoing reasons, Botting's motion to dismiss for lack of personal jurisdiction is DENIED.  Botting's motion to dismiss for failure to state a claim is GRANTED IN PART and DENIED IN PART.  Specifically, Ruiz's disparate-treatment claim in connection with the Asia-desk responsibilities, his hostile-work-environment claim, and his retaliation claim in connection with the events of October to December 2018 may proceed as asserted under the NYCHRL. Ruiz's remaining claims are DISMISSED.

The Clerk of Court is respectfully directed to terminate the pending motion at Doc. 21.

SO ORDERED.

Dated: June 10, 2025
      New York, New York

                                     Vernon S. Broderick
                                     United States District Judge